# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68467-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| LARRY EUGENE MULANAX, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 18, 2014 |
| | ) | |

2014 FEB 18 AM 10: 25

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

LEACH, C.J. — Larry Mulanax appeals his convictions for possession of cocaine with intent to manufacture or deliver, with a firearm allegation; assault in the second degree with intent to commit unlawful imprisonment; unlawful imprisonment; and intimidating a witness. He claims that the trial court erred by imposing a firearm enhancement when the jury found only that he possessed a deadly weapon. He also contends that his convictions for both unlawful imprisonment and second degree assault with intent to commit unlawful imprisonment violated the prohibition against double jeopardy. He challenges the admission of evidence of his prior misconduct to show modus operandi under ER 404(b) and the sufficiency of the evidence supporting his conviction for intimidating a witness. Finally, he alleges prosecutorial misconduct. We find no

merit in Mulanax's arguments about ER 404(b), sufficiency, and prosecutorial misconduct. However, the State concedes error in the firearm enhancement, and Mulanax's convictions for both unlawful imprisonment and assault with intent to commit unlawful imprisonment put him in double jeopardy. We affirm Mulanax's convictions for possession, assault with intent to commit unlawful imprisonment, and intimidating a witness. But we vacate the firearm enhancement and the conviction for unlawful imprisonment and remand for resentencing.

## FACTS

In July 2011, Kaylynn Swanson, Richard Ace Brown, Mary Schuman, and Jennifer Bertalan were staying with Larry Mulanax at his home. Swanson, Bertalan, Brown, and Schumann all used illegal drugs. Mulanax provided and allowed the use of cocaine in his house.

Around noon on July 30, 2011, Schumann gave Swanson permission to borrow her car. Swanson agreed to have it back by 5:00 p.m. but did not return until after midnight. Brown, Schuman, Bertalan, and Mulanax discussed "what kind of revenge should happen." Mulanax, Brown, and Bertalan wanted to cut her hair; Schuman wanted to beat her up.

When Swanson returned, she went back to Schuman's bedroom to return her keys and explain her absence. Brown came into the bedroom and

confronted Swanson. He ordered her to undress and used his pocketknife to cut off her ponytail. Mulanax entered the room and told Swanson that she "had a choice to either have the rest of her hair cut off or get beat up really bad." Brown and Bertalan cut and shaved the rest of Swanson's hair. Brown told Swanson not to move or he would hurt her. Bertalan told Swanson, "Don't worry honey, this happened to me too." Mulanax watched and told Brown and Bertalan when to stop cutting Swanson's hair. Mulanax said to Swanson, "God, don't be so distressed. You are lucky. . . . [T]he last two girls I seen this happened to, they beat the living hell out of too, and you ain't got a mark on you." Then Mulanax took pictures of Swanson naked with her head shaved and told Swanson that the pictures were for his own use and benefit.

Swanson testified that she knew what was going to happen because she was present some time earlier when Mulanax ordered others to shave Bertalan's head and beat her up after she stole from him.[1] Swanson was present when the two individuals returned and when Mulanax paid them with crack cocaine. She later saw a photo of Bertalan with a shaved head and black eyes.

After Mulanax took photos, Brown and Mulanax drove Swanson to a friend's house at her request. Swanson said, "Ace first threatened me that if they were to think for any reason I was going to call anyone or call the police, that

---

[1] Bertalan testified at trial that this occurred while she was staying at a motel in Everett in May 2011.

they wouldn't let me go" and that Mulanax said, "[I]f he thought for any reason I was going to be telling anyone, that he wouldn't let me go." Two days later, Swanson reported the incident to police. In a subsequent search of Mulanax's home, police found 22 small "baggies" of cocaine, digital scales, drug paraphernalia, and two firearms. They also found the photographs of Swanson and Swanson's ponytail in Mulanax's safe. Mulanax had the keys to the safe in his pocket. Police recovered a photograph of Bertalan's shaved head on Mulanax's computer hard drive.

The State charged Mulanax with possession of a controlled substance with intent to manufacture or deliver, with a firearm allegation; second degree assault with intent to commit unlawful imprisonment; unlawful imprisonment; and intimidating a witness. Mulanax moved to exclude the evidence associated with the attack on Bertalan, but the trial court admitted the evidence under ER 404(b) for the purpose of showing a modus operandi.

The jury found Mulanax guilty as charged and also found in a special verdict that Mulanax was armed with a deadly weapon when he committed the crime of possession with intent to deliver. Mulanax appeals.

ANALYSIS

ER 404(b)

Mulanax argues that the trial court improperly admitted under ER 404(b) the "brutally prejudicial" evidence associated with the uncharged assault against Bertalan. He contends that "[t]he purported 'modus operandi' was insufficiently proven and not probative where identity was not an issue." He argues further that the prosecutor misused the evidence by urging the jury to convict Mulanax for both incidents, though one was uncharged.

Interpretation of a rule of evidence presents a question of law that we review de novo.[2] If the trial court correctly interpreted the rule, this court reviews the trial court's decision to admit or exclude evidence for an abuse of discretion.[3] A trial court abuses its discretion if it bases its decision on untenable grounds or reasons.[4]

"ER 404(b)[5] is a categorical bar to admission of evidence for the purpose of proving a person's character and showing that the person acted in conformity

---

[2] State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007).
[3] Foxhoven, 161 Wn.2d at 174; State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).
[4] State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).
[5] ER 404(b) provides, in full:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

with that character."[6] Though "there are no 'exceptions' to this rule,"[7] the rule permits a court to admit prior misconduct for certain other purposes, such as proof of motive, plan, or identity.[8] To admit such evidence, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is offered, (3) determine if the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against its prejudicial effect.[9] The court must conduct its analysis on the record.[10]

Evidence of prior bad acts introduced to establish a modus operandi is relevant to the charged crime "only if the method employed in the commission of both crimes is 'so unique' that proof that an accused committed one of the crimes creates a high probability that he also committed the other crimes with which he is charged"[11] and "when the focus of the inquiry is the identity of the perpetrator, not whether the charged crime occurred."[12] The modus operandi alleged "'must

---

[6] Gresham, 173 Wn.2d at 420.
[7] Gresham, 173 Wn.2d at 421.
[8] Foxhoven, 161 Wn.2d at 175; State v. Everybodytalksabout, 145 Wn.2d 456, 465-66, 39 P.3d 294 (2002).
[9] In re Det. of Coe, 175 Wn.2d 482, 493, 286 P.3d 29 (2012) (quoting Foxhoven, 161 Wn.2d at 175).
[10] Foxhoven, 161 Wn.2d at 175.
[11] Thang, 145 Wn.2d at 643 (quoting State v. Russell, 125 Wn.2d 24, 66-67, 882 P.2d 747 (1994)).
[12] State v. DeVincentis, 150 Wn.2d 11, 21, 74 P.3d 119 (2003).

be so unusual and distinctive as to be like a signature.'"[13] A sufficiently unique method does not require each feature of the crime to be unique; seemingly common features, especially when combined with a lack of dissimilarities, can combine to create a unique signature.[14] But when too many dissimilarities exist, the evidence should be excluded.[15] "'Whether the prior offenses are similar enough to the charged crime to warrant admission is left to the discretion of the trial court.'"[16]

Following the State's offer of proof, the trial court (1) found by a preponderance of the evidence that the prior misconduct involving Bertalan occurred; (2) identified the purpose for the evidence as modus operandi; (3) determined that the evidence was relevant to prove Mulanax's identity and involvement in the charged crime; and (4) found that the evidence of the prior act, though undoubtedly prejudicial, was not more heinous than the charged crime, and consequently that its probative value outweighed its prejudicial effect.

---

[13] Foxhoven, 161 Wn.2d at 176 (internal quotation marks omitted) (quoting State v. Coe, 101 Wn.2d 772, 777, 684 P.2d 668 (1984)).

[14] Coe, 175 Wn.2d at 494 (citing Thang, 145 Wn.2d at 644); see also State v. Bradford, 56 Wn. App. 464, 468-69, 783 P.2d 1133 (1989) (finding sufficient similarities where burglaries committed by two black males driving small blue pickup truck, one or both wearing baseball caps, at night in mobile home display lots, using channel lock pliers to twist off doorknobs); State v. Jenkins, 53 Wn. App. 228, 237, 766 P.2d 499 (1989) (finding sufficient similarities where burglaries committed by offender driving brown Camaro, at only ground floor units, with partner, using pipe wrench to open door).

[15] Coe, 175 Wn.2d at 494 (citing Thang, 145 Wn.2d at 645).

[16] Foxhoven, 161 Wn.2d at 177 (quoting Jenkins, 53 Wn. App. at 236).

The court found "strong" similarities between the prior act and the charged crime and that they supported the ruling.

Mulanax first contends that because he does not dispute his presence at the assault on Swanson, evidence of a prior act has little or no probative value to prove identity. The defendant in State v. Fualaau[17] argued that because the State had two live witnesses who would testify that he committed the current offenses, the evidence of prior crimes was not necessary to prove identity and should be excluded. Because Fualaau's alibi defense "placed the question of identity squarely at issue," however, the trial court admitted the evidence, and we affirmed the trial court's ruling.[18]

In State v. Vy Thang,[19] the trial court admitted evidence of the defendant's prior assault conviction for the purpose of proving identity at his murder trial. Like Mulanax, Thang denied committing the crime but admitted he was present at the scene.[20] The Washington Supreme Court held that the trial court erred in admitting evidence of the prior crime, but not because Thang's undisputed presence destroyed the evidence's relevance to show identity. Rather, the admission was erroneous because the merely general similarities between the

---

[17] 155 Wn. App. 347, 353-54, 228 P.3d 771 (2010).
[18] Fualaau, 155 Wn. App. at 354, 356.
[19] 145 Wn.2d 630, 640-41, 41 P.3d 1159 (2002).
[20] Thang, 145 Wn.2d at 640-41.

two crimes were not sufficiently signature-like to constitute modus operandi.[21] Whether the defendant presents an alibi defense or concedes he was present, denial of all involvement in a crime admittedly committed puts the identity of the perpetrator at issue. In each instance, the defendant necessarily asserts that someone else committed the crime. Thus, evidence of a prior bad signature-like act by the defendant becomes relevant. The trial court properly interpreted ER 404(b) to conclude that Mulanax's undisputed presence did not destroy the relevance of evidence of his prior act offered to show modus operandi.

Our inquiry does not end with relevance, however. As we noted in Fualaau, "The critical determination for the trial court to make is whether there are sufficient similarities between the crimes to make evidence of the prior crime probative of the defendant's identity as the perpetrator of the crime charged."[22] In Fualaau, both the currently charged and prior assaults shared a number of similar features consistent with a ritual punishment. We concluded that the distinctive ritualistic qualities shared by the two crimes made evidence that the

---

[21] Thang, 145 Wn.2d at 643-45 (concluding that theft of a purse and jewelry, elderly victims who were kicked, perpetrator's allegedly similar remarks were not probative of modus operandi, especially where there was no geographic or temporal proximity, and collecting cases showing absence or presence of modus operandi).

[22] Fualaau, 155 Wn. App. at 357.

defendant committed the first "strongly probative of his identity as the perpetrator of the second, notwithstanding any dissimilarities between the two events."[23]

Though it does not demonstrate a particular tradition or ritual as in Fualaau, the record here reveals distinctive and unusual similarities between the earlier uncharged assault against Bertalan and the charged assault against Swanson. Both involved young women with drug addictions who appeared to be under Mulanax's patronage and/or control. Others carried out both assaults, allegedly at Mulanax's direction, to punish the unauthorized taking or holding of property. Both involved the cutting and shaving of the victim's hair, accompanied by a beating or the threat of a beating. Both women said they were warned not to go to the police. Mulanax admitted photographing both women sometime after their heads were shaved, and police seized evidence of both incidents from Mulanax's safe and computer hard drive. Moreover, there was temporal and geographic proximity between the incidents: Bertalan's took place in Everett, sometime around May 2011; Swanson's occurred in Stanwood, a city in the same county, at the end of July 2011.[24] Having found by a preponderance of the evidence that the assault on Bertalan occurred, the trial court did not abuse its

---

[23] Fualaau, 155 Wn. App. at 358.

[24] See also Russell, 125 Wn.2d at 68 (allowing joinder of two signature-like murders occurring a few weeks apart in Bellevue-Kirkland area). Contra Thang, 145 Wn.2d at 644 (finding proximity factor not satisfied when crimes committed 18 months apart, on opposite sides of state).

discretion in concluding that the peculiar similarities between the two incidents warranted admission of the prior act under ER 404(b).

We reject Mulanax's assertion that the prosecutor's references to this evidence in closing argument were improper and "tainted the trial." The prosecutor argued in closing that Mulanax "ruined lives with his assaults. He ruined lives with his threats." The prosecutor then urged the jury to "take control away from him" and "find him guilty of all four crimes." Mulanax argues that this was reversible error because the prosecutor "urge[d] a conviction based on Mulanax's propensity or potential for dangerous behavior," violating ER 404(b)'s "categorical bar" against propensity evidence.

During closing argument, the prosecutor has "wide latitude in drawing and expressing reasonable inferences from the evidence."[25] The prosecutor's comments here were tied to the properly admitted evidence at trial. "[A]ll four crimes" referred to the four charged crimes. Mulanax fails to demonstrate prosecutorial misconduct.

Sufficiency: Intimidating a Witness

Mulanax also challenges the sufficiency of the evidence supporting his conviction for intimidating a witness. He contends that his remarks to Swanson after the incident were "about past events, where [he] described his prior

---

[25] State v. Gentry, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995).

thoughts" and do not show an intent to prevent Swanson from reporting the crimes. He also argues that the remarks are vague and "do not express the required intent to inflict harm in the future essential for a true threat."

Courts review constitutional questions de novo, and in a case involving pure speech engage in an independent review of the record to ensure a conviction is not a "'forbidden intrusion on the field of free expression.'"[26] RCW 9A.72.110(1) defines the offense of intimidating a witness as the use of a threat against a current or prospective witness to influence testimony, induce the witness to elude legal process or absent herself, or not report the offense. "Importantly, only threats that are 'true' may be proscribed."[27] Our Supreme Court has adopted an objective test of what constitutes a "true threat": "'[A] statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life' of another person."[28] This objective standard focuses on the speaker, who need not

---

[26] State v. Schaler, 169 Wn.2d 274, 282, 236 P.3d 858 (2010) (internal quotation marks omitted) (quoting State v. Kilburn, 151 Wn.2d 36, 49-50, 84 P.3d 1215 (2004)).
[27] Schaler, 169 Wn.2d at 283.
[28] Kilburn, 151 Wn.2d at 43 (alteration in original) (internal quotation marks omitted) (quoting State v. Williams, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001)).

actually intend to carry out the threat: "It is enough that a reasonable speaker would foresee that the threat would be considered serious."[29]

Sufficiency of the evidence also presents a question of constitutional magnitude that a defendant may raise for the first time on appeal.[30] Sufficient evidence supports a conviction if, when viewed in a light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.[31] A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences from that evidence.[32] A reviewing court need not be convinced of the defendant's guilt beyond a reasonable doubt, but only that substantial evidence supports the State's case.[33] We do not review issues of credibility or persuasiveness of the evidence.[34]

To define the element of threat in the offense of intimidating a witness, the trial court instructed the jury as follows:

> Threat means to communicate, directly or indirectly, the intent to cause bodily injury to the person threatened or to any other person . . . .

---

[29] Schaler, 169 Wn.2d at 283.
[30] State v. Alvarez, 128 Wn.2d 1, 10, 904 P.2d 754 (1995).
[31] State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).
[32] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).
[33] State v. Fiser, 99 Wn. App. 714, 718, 995 P.2d 107 (2000).
[34] Fiser, 99 Wn. App. at 719.

> Threat also means to communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time.
>
> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

Mulanax relies on State v. Brown,[35] where the defendant said in a phone conversation that he "had thought about shooting" the judge who sentenced him for driving under the influence of an intoxicant. Mulanax argues that, like Brown's remarks, his words were not true threats but only past thoughts, which the State may not criminalize.[36]

Brown is inapposite. Mulanax was not describing his past thoughts about an earlier event to an uninvolved third party. While Brown forced Swanson to submit to head-shaving and nude photographs, Mulanax told her that "the last two girls" he'd seen this happen to, "they beat the living hell out of too." Swanson had seen a photograph of Bertalan with a shaved head and black eyes. Mulanax also said that "if he thought for any reason [she] was going to be telling anyone, that he wouldn't let [her] go." Given the context of the statements, a reasonable person in the speaker's position would foresee that Mulanax's statements would be interpreted not as past thoughts but as a serious expression of intention to

---

[35] 137 Wn. App. 587, 589-90, 154 P.3d 302 (2007).
[36] See Brown, 137 Wn. App. at 591-92.

carry out a threat of bodily harm. A reasonable juror could have found that Mulanax made the statements to influence Swanson against reporting the crime. Sufficient evidence supports Mulanax's conviction.

Finally, Mulanax argues that by not including the words "true threat" in the "to-convict" instructions, the trial court omitted an "essential element" of the offense, thereby diluting the State's burden of proof. But the definition of an element is not the element itself. "No Washington court has ever held that a true threat is an essential element of any threatening-language crime or reversed a conviction for failure to include language defining what constitutes a true threat in a charging document or 'to convict' instruction."[37] In its jury instructions, the trial court correctly stated the requirement of a serious expression of intention to inflict bodily harm. We affirm Mulanax's conviction for intimidating a witness.

Prosecutorial Misconduct

In her closing argument, the prosecutor characterized the law of accomplice liability as "the easiest way to think of this is sort of in for a penny, in for a pound." Mulanax contends that this statement misrepresents the law and constitutes prosecutorial misconduct.[38] Because Mulanax did not object to the

[37] State v. Tellez, 141 Wn. App. 479, 483, 170 P.3d 75 (2007); see also State v. Allen, 176 Wn.2d 611, 628, 294 P.3d 679 (2013).
[38] See In re Pers. Restraint of Wilson, 169 Wn. App. 379, 392, 279 P.3d 990 (2012) (finding prejudicial cumulative error that included the prosecutor's use of the "now-discredited argument of 'in for a penny, in for a pound'"), review denied, No. 87901-0 (Wash. Mar. 1, 2013).

alleged misconduct at trial, he cannot raise this issue on appeal unless the misconduct was "so flagrant and ill intentioned" as to cause enduring prejudice that could not have been cured by instruction to the jury and had a substantial likelihood of affecting the verdict.[39]

Though we have characterized the "in for a penny" explanation as "discredited," these remarks are not the type of comments that the Washington Supreme Court has found to be inflammatory.[40] In the two cases Mulanax cites in support of his position, In re Personal Restraint of Wilson[41] and State v. Cronin,[42] the prejudicial error that this court and the Supreme Court found was not primarily the "in for a penny" remark, but rather the improper arguments, erroneous instructions,[43] and "meager evidence" supporting the accomplice convictions.

Here, the prosecutor followed the general "in for a penny" illustration with a specific application of the law:

---

[39] State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

[40] Emery, 174 Wn.2d at 763 (collecting cases where prosecutor's inflammatory comments prejudiced defendant); see also State v. Monday, 171 Wn.2d 667, 678-79, 257 P.3d 551 (2011) (holding prosecutor's appeal to racial bias was improper and prejudicial).

[41] 169 Wn. App. 379, 392, 279 P.3d 990 (2012), review denied, No. 87901-0 (Wash. Mar. 1, 2013).

[42] 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000).

[43] Prosecutors in both cases stated that accomplice liability attaches when the defendant knows that he or she is aiding in the commission of any crime, not "the" crime charged, as the statute requires. In Wilson, the obsolete jury instruction likewise said "a crime." 169 Wn. App. at 390.

The defendant is legally accountable for the actions of Ace and for the actions of Jennifer because he helped plan this. He directed their actions. He supervised it. He stood by ready to lend them aid. And he finished it up by taking pictures and telling [Swanson] that if she told anyone what happened there, they weren't going to let her go. That makes the defendant an accomplice to what happened in that room . . . because it all happened under his supervision.

This stated the law of accomplice liability correctly. The jury also received proper instruction from the trial court. We reject Mulanax's prosecutorial misconduct claim.

Double Jeopardy

Mulanax asserts that his convictions for both unlawful imprisonment and assault in the second degree with intent to commit unlawful imprisonment violate the prohibition against double jeopardy. According to Mulanax, "The unwanted touching necessary to prove the assault charge was the same evidence used to prove the restraint element of the unlawful imprisonment allegation."

A double jeopardy claim presents a question of law reviewed de novo.[44] The guaranty against double jeopardy in the United States and Washington State Constitutions protects against multiple punishments for the same offense.[45] A defendant may raise a double jeopardy challenge for the first time on appeal.[46] Multiple convictions may constitute a double jeopardy violation even when

---

[44] State v. Frodert, 84 Wn. App. 20, 25, 924 P.2d 933 (1996).
[45] State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995).
[46] State v. Adel, 136 Wn.2d 629, 631-32, 965 P.2d 1072 (1998).

sentences run concurrently because separate convictions implicate other adverse collateral consequences.[47]

Within constitutional limits, a legislature has the power to define prohibited conduct and to assign punishment.[48] To analyze a double jeopardy claim, a court must determine what punishments the legislative branch has authorized and if it intended to impose separate punishments for the acts that led to the defendant's convictions.[49] This court applies a three-part test to determine if the legislature intended to impose multiple punishments for the same criminal conduct.[50] First, the court examines the statutory language to determine if it expressly authorizes multiple convictions for a single act.[51] Second, if the relevant statutes do not reveal an express intent to impose multiple punishments, Washington courts apply a "same evidence test" that is similar to the rule set forth in Blockburger v. United States:[52] offenses are the "same offense" for

---

[47] Calle, 125 Wn.2d at 773-74.

[48] Calle, 125 Wn.2d at 776.

[49] Calle, 125 Wn.2d at 776 (citing Whalen v. United States, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980)); State v. Baldwin, 150 Wn.2d 448, 454, 78 P.3d 1005 (2003).

[50] State v. Martin, 149 Wn. App. 689, 698, 205 P.3d 931 (2009); see also Calle, 125 Wn.2d at 776-80.

[51] Calle, 125 Wn.2d at 776; Martin, 149 Wn. App. at 698. RCW 9A.52.050, where the legislature explicitly provided for cumulative punishments for crimes committed during a burglary, is an example of this express authorization.

[52] 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

purposes of double jeopardy when the crimes are the same in fact and in law.[53]

"Offenses are the same in fact when they arise from the same act or transaction. They are the same in law when proof of one offense would also prove the other."[54] The Washington Supreme Court has emphasized that when courts apply the Blockburger-"same evidence" test, they must compare elements of the offenses not in the abstract, but as charged and proved at trial.[55]

Third, when two offenses satisfy the Blockburger-"same evidence" test, courts look for any evidence of contrary legislative intent that would rebut the presumption that multiple convictions are appropriate.[56] Where the degree of one offense depends on conduct constituting a separate offense, the merger doctrine may help determine legislative intent, and the court will examine if the commission of the "included" crime had an independent purpose or effect from the other crime.[57] "[W]hen separately criminalized conduct raises another offense to a higher degree, we presume that the legislature intended to punish

---

[53] State v. Vladovic, 99 Wn.2d 413, 423, 662 P.2d 853 (1983).
[54] Martin, 149 Wn. App. at 699 (citing Calle, 125 Wn.2d at 777-78).
[55] In re Pers. Restraint of Orange, 152 Wn.2d 795, 818, 100 P.3d 291 (2004); see also Martin, 149 Wn. App. at 699-700.
[56] Calle, 125 Wn.2d at 780.
[57] State v. Freeman, 153 Wn.2d 765, 778-79, 108 P.3d 753 (2005); Martin, 149 Wn. App. at 699.

both offenses only once, namely, for the more serious crime with the greater sentence."[58]

The State relies heavily on State v. Frohs,[59] in which this court considered a challenge to separate convictions for assault in the fourth degree and unlawful imprisonment and affirmed both convictions. Important facts in Frohs distinguish it. The assault was in the fourth degree and was therefore the lesser offense. It was not predicated on the unlawful imprisonment; the court emphasized that the defendant had already assaulted and injured the victim before he told her she would be shot if she tried to leave.[60]

We consider State v. Leming[61] more analogous. There, the jury found defendant Leming guilty of multiple charges that included felony harassment and second degree assault "predicated on felony harassment."[62] The court noted that to prove the felony harassment charge, "the State had to prove that Leming (1) threatened to kill [the victim] and (2) that she feared he would carry out the threat."[63] To prove the assault in the second degree charge, the State had to

---

[58] State v. Leming, 133 Wn. App. 875, 882, 138 P.3d 1095 (2006) (citing Freeman, 153 Wn.2d at 772-73).

[59] 83 Wn. App. 803, 804-05, 924 P.2d 384 (1996).

[60] Frohs, 83 Wn. App. at 815. The court continued, "We doubt that [the victim] would agree that she suffered no separate injury from the assault that was distinct from the injury of unlawful restraint." Frohs, 83 Wn. App. at 815.

[61] 133 Wn. App. 875, 138 P.3d 1095 (2006).

[62] Leming, 133 Wn. App. at 880.

[63] Leming, 133 Wn. App. at 889.

prove that Leming assaulted his victim "by intending to place her in fear that he would carry out his threat to kill her. In short, the State had to prove the same facts for both crimes, namely, that Leming committed felony harassment."[64] The court held that these two convictions "predicated on the same acts of felony harassment" resulted in multiple punishments for the same offense and thereby violated Leming's federal and state constitutional rights by putting him in double jeopardy.[65] The court reversed Leming's conviction for felony harassment, the lesser offense, because "the felony harassment conviction was incidental to the second degree assault conviction."[66]

The State charged Mulanax with an assault that was raised to the second degree by intent to commit unlawful imprisonment. The lesser offense is not the assault, as in Frohs, but the unlawful imprisonment.[67] An abstract examination of the elements of assault and of unlawful imprisonment does satisfy the "same evidence" test; proof of an assault is not necessary to prove unlawful imprisonment.[68] But as in Leming, where the two convictions were predicated on the same acts of felony harassment, here the two convictions are predicated on the same act of unlawful imprisonment. This violates the prohibition against

---

[64] Leming, 133 Wn. App. at 889.
[65] Leming, 133 Wn. App. at 889.
[66] Leming, 133 Wn. App. at 887.
[67] Assault in the second degree is a class B felony. RCW 9A.36.021(2)(a). Unlawful imprisonment is a class C felony. RCW 9A.40.040(2).
[68] Frohs, 83 Wn. App. at 814.

double jeopardy. We affirm Mulanax's conviction for assault with intent to commit unlawful imprisonment but vacate his conviction for unlawful imprisonment as the lesser offense.[69]

Firearm Enhancement

The jury found that Mulanax was armed with a deadly weapon at the time of the commission of the crime of possession with intent to deliver a controlled substance. The trial court imposed a firearm enhancement of 36 months. The State concedes that this was erroneous. When the trial court instructs the jury on a specific enhancement, the court is bound by the jury's finding.[70] Here, the jury verdict authorized only a deadly weapon enhancement, not the more severe firearm enhancement. We remand for resentencing consistent with the jury's finding of a deadly weapon enhancement.[71]

CONCLUSION

Because the trial court properly admitted ER 404(b) evidence to show modus operandi, sufficient evidence supported Mulanax's conviction for intimidating a witness, and Mulanax fails to show any prejudicial error in the prosecutor's closing argument, we affirm his convictions for possession of cocaine with intent to deliver, assault in the second degree with intent to commit

---

[69] See Martin, 149 Wn. App. at 701.
[70] State v. Williams-Walker, 167 Wn.2d 889, 899, 225 P.3d 913 (2010).
[71] Williams-Walker, 167 Wn.2d at 897.

unlawful imprisonment, and intimidating a witness. But we vacate Mulanax's conviction for unlawful imprisonment and the firearm enhancement and remand for resentencing.

_Leach, C.J._

WE CONCUR:

_Appelwick, J._

_Cox, J._